UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NORMA L. COOKE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 15 C 817 |
| v. ) | |
| ) | Chief Judge Rubén Castillo |
| JACKSON NATIONAL LIFE ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

In this diversity breach of contract case, Norma L. Cooke ("Plaintiff") seeks payment of a life insurance policy obtained by her late husband, Charles E. Cooke ("Cooke"). Plaintiff, the policy's beneficiary, alleges that Jackson National Life Insurance Company ("Defendant") breached the terms of the policy by increasing the premium payment due while Cooke's account was in a grace period following a missed payment. (R. 1, Compl. ¶ 31.) Presently before the Court is Plaintiff's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (R. 18, Pl.'s Mot.) For the reasons stated below, Plaintiff's motion is denied.

## RELEVANT FACTS

On July 28, 1998, Southwestern Life Insurance Company issued a life insurance policy to Cooke. (R. 10, Answer ¶ 7.) Under the policy, Cooke received $200,000 of coverage for a term of fifteen years. (*Id.* ¶ 8.) The policy also gave Cooke the option to renew his policy at a higher premium once the initial fifteen-year term ended. (R. 1-1, Compl., Ex. A at 13.) At some point during Cooke's coverage, Defendant acquired the policy. (R. 10, Answer ¶ 4.) The policy included a grace period provision for missed payments, containing the following language:

> Except for the first premium, we allow a Grace Period of 31 days beginning on the due date to pay the premium. The policy will remain in force during the Grace Period. If the Insured dies during the Grace Period, the unpaid premium will be deducted from the Proceeds.
>
> Any premium not paid on or before its due date is a premium in default. If a premium in default is not paid before the end of the Grace Period, the policy will terminate.

(R. 1-1, Compl., Ex. A at 13.) The policy provides for quarterly premium payments. (*Id.* at 4.) However, according to Defendant, "[Cooke] entered into a separate and additional contract . . . which authorized the withdrawal of premiums on a monthly basis" subject to "specific terms and conditions." (R. 10, Answer ¶ 46.) Both parties agree that Cooke paid his premium on a monthly basis via automatic bank withdrawal for roughly fifteen years. (*Id.* ¶ 47.)

As Cooke neared the end of his fifteen-year term, Defendant issued him a notice dated May 30, 2013, informing him that his premium would increase to $2,835.85 beginning July 28, 2013. (*Id.* ¶ 11.) The letter also informed Cooke that he would "be billed at the same frequency or mode" as the current premium and that $2,835.85 would be his "new modal premium amount." (R. 1-2, Compl., Ex. B.)

On July 28, 2013, Defendant attempted to withdraw $2,835.85 from Cooke's bank account, but the withdrawal failed due to insufficient funds. (R. 10, Answer ¶ 12.) The missed payment triggered a grace period ending on August 28, 2013. (*Id.* ¶ 18.) Defendant notified Cooke of his account deficiency in a letter dated August 9, 2013. (*Id.* ¶ 14.) The letter informed Cooke that the policy would "terminate if the renewal premium [was] not received by the last day of the grace period." (R. 1-3, Compl., Ex. C.) Plaintiff also claims that she called Defendant on or about August 15, 2013, to determine the final date for payment under the grace period provision. (R. 1, Compl. at ¶¶ 15-16.) In this conversation, Defendant allegedly informed Plaintiff that it was withdrawing its consent to pay monthly premiums and that a quarterly

2

payment would be due by September 15, 2013. (*Id.* ¶ 16.) Defendant, however, denies all of Plaintiff's allegations regarding this telephone call. (R. 10, Answer ¶ 16.)

At some point, Defendant also mailed a separate payment notice to Cooke informing him that he owed a quarterly payment of $8,637.94 by July 28, 2013. (*Id.* ¶ 17.) The notice indicated that if Defendant did not receive payment by that date, the policy "[would] enter its grace period and [would] terminate if the renewal premium [was] not received by the last day of the grace period." (R. 1-4, Compl., Ex. D at 2.) Plaintiff claims the payment notice was issued on or about August 15, 2013, but the notice attached to Plaintiff's complaint does not display a date. (R. 1, Compl. at ¶ 17.) Defendant only admits that the letter exists, but it does not agree that it was sent on or about August 15, 2013. (R. 10, Answer ¶ 17.)

Cooke failed to make any payments before August 28, 2013, the last day of the grace period. (*Id.* ¶ 18.) On September 10, 2013, Cooke passed away. (*Id.* ¶ 19.) Three days later, on September 13, 2013, Defendant received a check from Plaintiff for $8,637.94. (*Id.* ¶¶ 20-21.) Three days after that, on September 16, 2013, Defendant issued a letter to Cooke stating that the policy had lapsed for failure to pay the premium within the grace period. (*Id.* ¶ 22.)

Plaintiff filed her complaint on January 27, 2015. (R. 1, Compl.) Plaintiff alleges that Defendant breached the policy in either of two ways: (1) by misrepresenting that an increased quarterly payment was due to satisfy the grace period despite that provision's requirement that "the premium due" at the time of default would suffice, (R. 1, Compl. ¶ 31); or (2) by not extending the grace period by 31 days when it demanded a larger quarterly payment, (*id.* ¶ 33). Plaintiff also asserts that Defendant waived its right to demand quarterly payments because the May 30 letter changed Cooke's premium frequency to monthly. (*Id.* ¶¶ 51, 54.) In addition, Plaintiff claims that Defendant should be estopped from enforcing the original grace period and

3

denying that a new grace period was created by the quarterly payment demand. (*Id.* ¶ 61.) Lastly, Plaintiff asks this Court to find that Defendant's actions allegedly changing the terms and dates of required payments were "vexatious and unreasonable" in various ways in violation of the Illinois Insurance Code, 215 ILL. COMP. STAT. 5/155. (*Id.* ¶¶ 63-70.) Defendant answered on March 24, 2015. (R. 10, Answer.) Defendant denies that Plaintiff was entitled to a new grace period, that it waived its right to demand quarterly payments, and that it is bound by promissory estoppel. (*Id.* ¶¶ 35, 51.) Defendant also denies that it acted in a vexatious and unreasonable manner. (*Id.* ¶ 66.)

Without seeking any discovery, Plaintiff filed the present motion for judgment on the pleadings on July 2, 2015. (R. 18, Pl.'s Mot.) Plaintiff argues that Defendant has admitted the validity of the documents attached to the complaint and, thus, all that remains is to interpret these documents as a matter of law. (*Id.* at 2-3.) Defendant responded on August 13, 2015. (R. 24, Def.'s Resp.) Defendant argues that it has denied that the contract attached to the complaint is complete, as there is "a separate contract . . . that set forth the terms governing [Cooke's] monthly installment payment election." (*Id.* at 4.) Defendant also argues that Plaintiff's motion relies on facts that Defendant has explicitly denied. (*Id.* at 8-9.) Plaintiff filed her reply on August 30, 2015. (R. 26, Pl.'s Reply.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) permits a party to "move for judgment on the pleadings after the filing of the complaint and answer." *Supreme Laundry Serv., L.L.C. v. Hartford Cas. Ins. Co.*, 521 F.3d 743, 746 (7th Cir. 2008). The pleadings consist of "the complaint, the answer, and any written instruments attached as exhibits." *Hous. Auth. Risk Retention Grp., Inc. v. Chi. Hous. Auth.*, 378 F.3d 596, 600 (7th Cir. 2004). A Rule 12(c) motion

is typically "governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Lodholtz v. York Risk Servs. Grp., Inc.*, 778 F.3d 635, 639 (7th Cir. 2015).

However, when a party uses a Rule 12(c) motion to attempt to win its case "on the basis of the underlying substantive merits," the correct standard "is that applicable to summary judgment, except that the court may consider only the contents of the pleadings." *Alexander v. City of Chi.*, 994 F.2d 333, 336 (7th Cir. 1993). Under this standard, judgment on the pleadings will not be granted unless "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty., Wis.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted).

The Court cannot weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). In other words, a motion for judgment on the pleadings "cannot be used to resolve swearing contests between litigants." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Instead, the Court's role is simply "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249).

**ANALYSIS**

**I. Choice of Law**

As a preliminary matter, the parties dispute which state's laws apply to the insurance policy. Plaintiff argues that Illinois law is appropriate, as the policy's beneficiary lived in Illinois. (R. 26, Pl.'s Reply at 1.) Although Plaintiff does not provide specific dates, she alleges that Cooke was domiciled at all times in Illinois and simply maintained a separate residence in South Carolina for work purposes. (*Id.* at 3.) As all of the correspondence to Cooke from May 30, 2013, onward was addressed to him in Illinois, the Court concludes that he had given notice to Defendant of his change in residence prior to this date. Defendant argues that because the policy was issued in South Carolina while Cooke resided there, South Carolina law should apply. (R. 24, Def.'s Resp. at 5-6.) The Court must thus determine which state's laws govern this action.

"Federal courts hearing state law claims under diversity . . . jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). Illinois only requires a choice-of-law determination "when a difference in law will make a difference in the outcome." *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 898 (Ill. 2007). When such a determination is necessary, Illinois follows the Restatement (Second) of Conflict of Laws ("Restatement") for contract actions. *Midwest Grain Prods. of Ill., Inc. v. Productization, Inc.*, 228 F.3d 784, 787-88 (7th Cir. 2000); *Swanberg v. Mutual Ben. Life Ins. Co.*, 398 N.E.2d 299, 301-02 (Ill. 1979) (applying Restatement in life insurance dispute). The Restatement states that in the absence of a contractual choice-of-law provision, a life insurance policy is governed by "the local law of the state where the insured was

domiciled at the time the policy was applied for" unless "some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 192. Section 6 provides "multiple and diverse principles [that] are not listed in any order of priority, and some of them point in different directions." *Townsend*, 878 N.E.2d at 900. These principles include "the relevant policies of the forum, . . . the relevant policies of other interested states and the relevant interests of those states in the determination of the particular issue, . . . the protection of justified expectations, . . . certainty, predictability and uniformity of result." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6. "While section 6 enunciates the guiding principles of the choice-of-law process, the most-significant-relationship formula describes the *objective* of that process: to apply the law of the state that, with regard to the particular issue, has the most significant relationship with the parties and the dispute." *Townsend*, 879 N.E.2d at 901 (citation omitted).

As Defendant notes repeatedly, the differences between South Carolina and Illinois law are unlikely to be outcome-determinative on most issues in this case. (R. 24, Def.'s Resp. at 6, 9, 10.) Indeed, the basic elements of common law contract doctrine, breach, waiver, and promissory estoppel are governed by the same principles in both states. However, Plaintiff's vexatious and unreasonable conduct count under § 5/155 differs from South Carolina's corresponding "bad faith" cause of action. Plaintiff alleges that Defendant acted in bad faith by demanding payments and denying coverage in an unreasonable or predatory manner. (R. 1, Compl. ¶¶ 63-69.) Most significantly, although both causes of action provide for recovery of attorney's fees and costs, the Illinois statute limits punitive damages to at most $60,000 while the South Carolina statute does not contain any such limitation. 215 ILL. COMP. STAT. 5/155; S.C. CODE ANN. § 38-59-20; *see also Townsend*, 879 N.E.2d at 899 (finding that different statutory caps on compensatory

7

damages constitute an outcome-determinative conflict). Thus, the Court must conduct a conflict-of-laws analysis regarding Plaintiff's claim that Defendant has vexatiously and unreasonably obstructed her collection of insurance benefits.

The Restatement recommends that life insurance policies should generally be governed by the law of the state in which the insured lived when the contract was executed. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 192. It also notes in a comment, however, that when the insured changes his residence after application for the policy, "the insured's new domicil will have the dominant interest in him" especially when "the substantial obligations of the insurance company under the policy" are not at issue. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 192 cmt. d. Where there is no significant danger of upsetting the insurance company's justified expectations with regard to contractual obligations, the subsequent state of residence will likely have the most significant relationship to the dispute. *See id.* (law of new state of residence may apply "particularly with respect to acts—such as the giving of notice of default by the insurance company—which are done following notice to the company of a change of domicil"). Although a choice-of-law analysis begins with the state in which the policy was signed, this single factor is not determinative.

The Court concludes that South Carolina has no significant relationship to Defendant's alleged bad faith in handling Cooke's policy. All of the relevant conduct pertaining to Plaintiff's claims occurred after May 30, 2013, and the record suggests that Cooke had resided in Illinois for some time prior to that date. (R. 26, Pl.'s Reply at 3.) While South Carolina surely has an interest in governing the terms of contracts that are entered into within its borders, it would seem to have little interest in policing the collections practices of Michigan-based insurers seeking premium payments from long-time residents of Illinois. Further, Defendant does not and cannot

credibly claim that its justified expectations that any alleged bad faith on its part would be governed by South Carolina's law were prejudicially ignored; Illinois's statute, with its cap on punitive damages, would seem to protect Defendant from unlimited liability more than the law that it proposes should apply. Simply put, the Court cannot identify any reason why Defendant would object to the application of Illinois law to this case in its entirety, and Defendant has not provided any such reason. Because the Court also cannot identify any reason why South Carolina has a more significant relationship to the claim of vexatious or unreasonable conduct than does Illinois, the Court will apply Illinois law to this dispute.

## II.   Breach of Contract

In her motion, Plaintiff argues that Defendant breached the contract as a matter of law by increasing the amount due during the grace period. (R. 18, Pl.'s Mot. at 5.) Plaintiff relies on the language of the grace-period provision, which allows "a Grace Period of 31 days beginning on the due date to pay the premium due." (R. 1-1, Compl., Ex. A at 13.) According to Plaintiff, the "premium due" was only the amount due on July 28, 2013, in the amount of $2,835.85. (R. 18, Pl.'s Mot. at 7.) Plaintiff argues that, because the grace period provision allows 31 days to pay "the premium due" when the insured failed to make a payment, the amount of the premium due cannot possibly be increased during the grace period. (*Id.*) Her first theory of breach, therefore, is that during the grace period the Defendant misrepresented that a larger, quarterly payment was due. (R. 1, Compl. ¶ 31.)

In her alternative theory, Plaintiff argues that even if the premium due could be increased during a grace period, the grace period provision would have required a *new* grace period of 31 days beginning on the day the premium was thus increased; as there is a new premium due, Plaintiff urges, there should be a new 31 days in which to pay "the premium due." (*Id.* ¶ 33)

9

According to Plaintiff, the premium was increased on August 15, 2013, and this newly due premium should have created a new grace period that would expire on September 15, 2013. (*Id.* ¶ 35) Under Plaintiff's alternative grace-period theory, she argues that Defendant would have been required to pay the policy benefits when Cooke passed away on September 10, 2013, because the grace period provision required the policy to "remain in force during the Grace Period." (R. 1-1, Compl., Ex. A at 13.)

Under Illinois law, contracts "must be construed as a whole, viewing each provision in light of the other provisions." *United States v. Rogers Cartage Co.*, 794 F.3d 854, 861 (7th Cir. 2015) (citation omitted). "[I]nstruments executed at the same time, by the same parties, for the *same purpose*, and in the course of the same transaction are regarded as one contract and will be construed together." *Dearborn Maple Venture, LLC v. SCI Ill. Servs., Inc.*, 968 N.E.2d 1222, 1232 (Ill. App. Ct. 2012) (citation omitted).

Both of Plaintiff's theories of breach rely entirely on the grace period provision being the sole contractual language governing the payments due after a missed payment. According to Plaintiff, the grace period provision either cements the amount of the premium due for the entire grace period or it requires a new grace period to be extended when the premium due is increased from a monthly to a quarterly sum. However, Plaintiff appears to ignore the fact that Defendant denies that the policy attached to Plaintiff's complaint "is the complete Policy." (R. 10, Answer ¶ 7.) Instead, Defendant claims that "a separate and additional contract . . . authorized the withdrawal of premiums on a monthly basis," subject to additional "terms and conditions." (R. 10, Answer ¶ 46.) Although Plaintiff argues that Defendant has admitted the existence of the contract attached to her complaint, the Court cannot interpret the contract as a matter of law without having the parties' entire agreement. *See Founders Ins. Co. v. Munoz*, 930 N.E.2d 999,

10

1004 (Ill. 2010) ("[A]n insurance policy must be considered as a whole; all of the provisions, rather than an isolated part, should be examined to determine whether an ambiguity exists."); *Dearborn Maple*, 968 N.E.2d at 1232. Drawing all reasonable inferences in favor of Defendant, the nonmovant, the Court must credit Defendant's claim that a relevant portion of the contract is not in the record. *Nat'l Am. Ins. Co.*, 796 F.3d at 723. For this reason, Plaintiff cannot prevail on her breach of contract claims as a matter of law at this early stage.

Even if the policy submitted by Plaintiff were the complete agreement, the Court still could not grant Plaintiff's motion on her breach of contract claim. Under Illinois law, "[t]he elements of a claim for breach of contract are (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)).

Assuming there is a valid and enforceable contract and Plaintiff was injured, there are additional factual issues relevant to Cooke's performance and Defendant's alleged breach. If, as Plaintiff alleges in her first theory of breach, Defendant was not allowed to increase the amount due during the original grace period, then Cooke would have needed to pay his monthly premium by August 28, 2013, in order to perform his part of the contract. However, it is undisputed that "the original Grace Period ended with no payment by [Cooke]." (R. 1, Compl. ¶ 8; R. 10, Answer ¶ 18.) Accordingly, Cooke would not have substantially performed and Plaintiff's breach claim would not succeed based on the pleadings.

The Court also could not grant relief on Plaintiff's second theory of breach due to factual disputes regarding the date of Defendant's demand for a quarterly payment. If the grace period

11

provision required Defendant to honor a new grace period when it demanded a quarterly payment, then the date of this demand is central to resolution of this claim. The grace period would last for 31 days from the date of the demand, and if Cooke neither paid the premium nor passed away within those 31 days, his policy would lapse. In Plaintiff's motion, she asserts that Defendant "admits sending [Cooke] another notice, undated, on August 15, 2013," demanding a quarterly payment. (R. 18, Pl.'s Mot. at 5.) However, when answering Plaintiff's complaint, Defendant only "admit[ted] the existence of the notice" and "denie[d] all remaining allegations contained in [the] paragraph." (R. 10, Answer ¶ 17.) Because Defendant denied that the undated notice was sent on August 15, any theory of breach based on the date of this notice cannot succeed at this stage. Even if Plaintiff could establish as a matter of law that the notice required a new grace period, there is a material dispute of fact about whether Cooke died within 31 days of the undated notice.

### III. Waiver

Plaintiff also argues that she is entitled to judgment as a matter of law because Defendant waived its right to demand quarterly payments. (R. 18, Pl.'s Mot. at 6.) Both parties agree that the written policy "required quarterly payments." (R. 10, Answer ¶ 46.) Both parties also agree that Cooke's premium was paid on a monthly basis for roughly fifteen years. (*Id.* ¶ 47). Defendant claims that the "monthly payments were withdrawn pursuant" to a separate and additional contract. (*Id.*) According to Plaintiff, notwithstanding that separate and additional agreement, Defendant waived its right to demand quarterly payments when it sent the May 30 letter stating that Cooke would "be billed at the same frequency or mode" as the current premium and that $2,835.85 would be his "new modal premium amount." (R. 1-2, Compl., Ex. B; R. 26, Pl.'s Reply at 4.) Thus, according to Plaintiff, even if Defendant had the right to withdraw

consent to make monthly payments under the original policy, it could not go back to demanding quarterly payments after waiving this right.

"Waiver is either an express or implied voluntary and intentional relinquishment of a known and existing right." *Midway Park Saver v. Sarco Putty Co.*, 976 N.E.2d 1063, 1071 (Ill. App. Ct. 2012) (citation omitted). "[W]aiver may be established by conduct indicating that strict compliance with . . . contractual provisions will not be required." *Bd. of Library Trs. of Midlothian v. Bd. of Library Trs. of Posen Pub. Library Dist.*, 34 N.E.3d 602, 614 (Ill. App. Ct. 2015) (citation omitted).

Drawing all reasonable inferences in favor of Defendant, the potential existence of a separate contract memorializing the terms of Cooke's monthly payments prevents this Court from granting Plaintiff's waiver claim as a matter of law. Without the separate contract, this Court cannot determine what specific rights Defendant had regarding monthly payments and whether Defendant voluntarily and intentionally relinquished those rights. Defendant may not have had the right to demand quarterly payments once Cooke defaulted, but without a clear picture of what Defendant's rights were regarding monthly payments, Plaintiff's waiver claim cannot succeed at this stage.[1]

Even if the additional contract did not exist, however, Plaintiff's waiver argument would still not entitle her to judgment under Rule 12(c). The original policy agreement contemplated quarterly premiums and allowed Defendant to consent to different payment modes at its discretion. The May 30 letter that Plaintiff relies on as evidence of Defendant's waiver states, "Your new premium of $2,835.85 will be billed at the same frequency or mode as your current

---

[1] Even if Defendant did waive its right to demand quarterly payments as a matter of law, Plaintiff would still be unable to show that she is entitled to relief under Rule 12(c). If Defendant waived its right to demand quarterly payments, Cooke still would have needed to pay his monthly premium before August 28, 2013, which the parties agree he did not do. (R. 1, Compl. ¶ 18; R. 10, Answer ¶ 18.)

premium. This is your new modal premium amount." (R. 1, Compl., Ex. B.) Plaintiff argues that "Defendant waived the quarterly mode, foregoing its prior consent for monthly billing in favor of making monthly the new frequency or mode." (R. 18, Pl.'s Mot. at 6.) However, the letter could be interpreted in either of two ways. It is possible, as Plaintiff suggests, that this letter represents Defendant's intentional relinquishment of its right to withdraw consent to make monthly payments and to change the baseline payment frequency from quarterly to monthly. However, the letter contains no mention of changing the policy terms, and the original policy's renewal provision establishes that "[t]he new policy will be on the same plan of insurance . . . as this policy." (R. 1-1, Ex. A at 15.) In other words, the new term of the policy would be governed by the same contract, including its quarterly payment provision and Defendant's discretionary consent to allow monthly payments. The other possible meaning of the May 30 letter's language was that Defendant was communicating to Cooke, at the outset of the new term, that it would continue to provide its consent for him to make monthly payments. What is certain is that neither reading is strictly compelled by the letter; further factual development is required to determine whether it constitutes waiver or consent. Because the Court must draw all reasonable inferences in Defendant's favor, Plaintiff cannot establish waiver on her motion under Rule 12(c).

## IV.     Estoppel

In Count IV of her complaint, Plaintiff claims that Defendant should be estopped from enforcing the original grace period begun when Cooke failed to pay his monthly premium on July 28 and estopped from denying the creation of a new grace period on the date of its demand for a quarterly premium amount. (R. 1, Compl. ¶ 61.) Although Plaintiff fails to present any argument addressing this count in her motion, she does mention estoppel at the end of her reply. (R. 26, Pl.'s Reply at 6.)

14

Under Illinois law, to claim estoppel, a party must demonstrate that:

(1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof.

*W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 794 F.3d 666, 679 (7th Cir. 2015) (quoting *Geddes v. Mill Creek Country Club, Inc.*, 751 N.E.2d 1150, 1157 (Ill. 2001)). "Estoppel is ordinarily a question of fact and only becomes a question of law where there is no dispute as to the material facts and only one inference can be drawn from those facts." *Bd. of Library Trs.*, 34 N.E.3d at 611.

The pleadings in this case contain no undisputed facts regarding Defendant's alleged knowledge that its representations were untrue or its expectation that Cooke would rely on them. In fact, there is only one allegation relating to Defendant's knowledge or intention: Plaintiff claimed that Defendant "made a knowingly false statement" when it demanded a quarterly premium without creating a new grace period. (R. 1, Compl. ¶ 55.) However, Defendant explicitly denied this fact. (R. 10, Answer ¶ 55.) Because Defendant's knowledge and intention in making allegedly false representations to Plaintiff comprise essential elements of a promissory estoppel claim, the existence of a genuine issue of material fact on these issues precludes judgment on the pleadings in favor of Plaintiff. *Nat'l Am. Ins. Co.*, 796 F.3d at 722-23.

## V. Vexatious and Unreasonable Conduct

Lastly, Plaintiff claims that Defendant engaged in vexatious or unreasonable behavior in its handling of Cooke's policy. *See* 215 ILL. COMP. STAT. 5/155. In her motion, Plaintiff appears

15

to argue that Defendant's alleged breach constituted per se vexatious and unreasonable conduct; she observes that Illinois law calls for a totality of the circumstances test, *Marchesi v. Ill. Farmers Ins. Co.*, 698 N.E.2d 683, 688 (Ill. App. Dist. 1998), notes that violations of insurance regulations can be factors in finding the requisite bad faith, *Meier v. Aetna Life & Cas. Standard Fire Ins. Co.*, 500 N.E.2d 1096, 1102 (Ill. App. Ct. 1986), and realleges her claim that Defendant breached the policy as evidence that it violated such insurance regulations. (R. 18, Pl.'s Mot. at 8-9.) Defendant responds that vexatious and unreasonable conduct is a question of fact and thus unfit for determination as a matter of law at the pleadings stage. (R. 24, Def.'s Resp. at 10.)

"Section 155 of the Illinois Insurance Code allows an insured to recover attorney fees when the insurer's denial of coverage or delay in payment is 'vexatious and unreasonable,' or when the insurer behaves vexatiously and unreasonably during the course of coverage litigation." *TKK USA, Inc. v. Safety Nat. Cas. Corp.*, 727 F.3d 782, 793 (7th Cir. 2013); *see also* 215 ILL. COMP. STAT. 5/155. "The question of vexatious and unreasonable action or delay is a factual issue" and "best left to the determination of the finder of fact." *Boyd v. United Farm Mut. Reinsurance Co.*, 596 N.E.2d 1344, 1349 (Ill. App. Ct. 1992). "A court should consider the totality of the circumstances when deciding whether an insurer's conduct is vexatious and unreasonable[.]" *Ill. Founders Ins. Co. v. Williams*, 31 N.E.3d 311, 317 (Ill. App. Ct. 2015) (citation omitted). Where an insurer "did not violate its obligations under the policy, it cannot be held liable for engaging in bad faith or improper practices under § 155." *Olivet Baptist Church v. Church Mut. Ins. Co.*, No. 13 C 1625, 2016 WL 772787, at *11 (N.D. Ill. Feb. 29, 2016) (citing *Rhone v. First Am. Title Ins. Co.*, 928 N.E.2d 1185, 1196 (Ill. App. Ct. 2010) ("Where the policy is not triggered, there can be no finding that the insurer acted vexatiously and unreasonably in denying the claim.")).

16

The Court has concluded above that Plaintiff cannot establish breach, waiver, or estoppel in light of the material disputes of fact lingering in this case. An insurer does not engage in vexatious and unreasonable conduct in denying policy benefits that it is entitled to deny, and Plaintiff has not yet shown that Defendant was not entitled to deny her benefits. Because Plaintiff cannot show, at this stage in the proceedings, that Defendant had an obligation to pay the policy benefits, she is not entitled to judgment on her vexatious and unreasonable conduct claim. *Rhone*, 928 N.E.2d at 1196.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (R. 18) must be DENIED. This Court sadly concludes that Plaintiff has prematurely filed for a judgment on the pleadings when there are serious factual disputes that need to be resolved through the discovery process. While Defendant has not been obliged to submit additional documents until this time, the Court hopes that all parties will henceforth work toward efficient resolution, and not delay, of this case. It may be that summary judgment may be obtainable following discovery, but this Court cannot presently enter judgment in this case for the reasons indicated herein.

The parties shall appear for a status hearing on April 13, 2016, at 9:45 a.m., and shall be prepared to set a firm litigation schedule for this lawsuit, including setting discovery dates. The parties are DIRECTED to reevaluate their settlement positions in light of this opinion and to exhaust all settlement possibilities prior to the status hearing.

ENTERED: _____
**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: March 15, 2016**