# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NORMA L. COOKE,        )
                       )
        Plaintiff,       )
                       )     **No. 15 C 817**
       v.               )
                       )     **Chief Judge Rubén Castillo**
JACKSON NATIONAL LIFE      )
INSURANCE COMPANY (successor to   )
Southwestern Life Insurance Company )
and Reassure America Life Insurance )
Company),                 )
                       )
        Defendant.      )

## MEMORANDUM OPINION AND ORDER

Norma Cooke ("Plaintiff") brings this diversity action against Jackson National Life Insurance Company ("Jackson"), alleging that it breached her late husband's life insurance policy by denying benefits after he died during the grace period for a missed premium payment. Presently before the Court are the parties' cross-motions for summary judgment.[1] (R. 42; R. 47.) For the reasons stated below, judgment is entered in favor of Plaintiff.

### RELEVANT FACTS

The following facts are undisputed unless otherwise stated. Plaintiff is an Illinois citizen whose late husband, Charles Cooke ("Cooke"), took out a life insurance policy from Southwestern Life Insurance Company on July 28, 1998. (R. 52, Pl.'s Resp. to Facts ¶¶ 1, 5.)

---

[1] Plaintiff accurately observes that Jackson failed to comply with this Court's standing order by serving the opposing party with a letter summarizing the legal and factual grounds for its motion. (R. 51, Pl.'s Resp. at 7.) In the interest of judicial efficiency, the Court has elected to decide this motion on its merits rather than dismiss it without prejudice for failing to comply with the standing order. Jackson is nonetheless strongly admonished to review and follow this Court's rules in any future filings.

Jackson is a Michigan life insurance and annuity corporation and is the successor in interest to the policy.[2] (*Id.* ¶¶ 2, 6.)

Cooke's policy had a death benefit of $200,000, naming Plaintiff as the beneficiary. (*Id.* ¶ 5; *see also* R. 37-1, Policy.) The policy had level premiums for a 15-year period, after which it could be renewed at a significantly higher premium rate. (R. 52, Pl.'s Resp. to Facts ¶¶ 14-16.) The Policy Data Page, which set forth the basic facts and terms of the policy such as its premium and coverage amount, notes that the premium frequency was to be quarterly.[3] (R. 37-1, Policy at 9.) The policy also provided that Cooke could pay his premiums by "any other mode or method" with Jackson's consent. (R. 52, Pl.'s Resp. to Facts ¶ 9; *see also* R. 37-1, Policy at 17.) Shortly after taking out the policy, Cooke submitted a form titled, "Request for Payment of Premiums by the Automatic Bank Deduction Program" ("EFT application"), which provided Cooke's bank account information to allow him to pay his premium by monthly bank draft on the 28th of every month. (R. 52, Pl.'s Resp. to Facts ¶¶ 9-10; *see also* R. 37-1, Policy at 33.) The EFT application was not signed by any employee of the insurer, (R. 37-1, Policy at 33), but the parties do not dispute that Cooke made monthly payments with Jackson's consent for the first 15 years of the policy until it expired on July 28, 2013, (R. 52, Pl.'s Resp. to Facts ¶ 13). Over the life of the policy, Cooke completed two more EFT applications. (*Id.* ¶ 10.)

The policy provided that, at the end of the initial coverage term of 15 years, the policy could be renewed for subsequent one-year periods. On each such date, Jackson could adjust the premiums up to a maximum annual premium for each year as set forth on the Policy Data Page.

---

[2] Although Jackson was not the insurer from the origination of the policy, the Court will uniformly refer to the policy's insurer as "Jackson" in the interest of simplicity.

[3] Although the Policy Data Page as submitted in this case has a handwritten addendum listing "Monthly Bank $348.70" under the word "Quarterly," (R. 37-1, Policy at 9), neither party addresses this note or makes arguments concerning its author. Even though the note is present on a copy with a Bates stamp from Jackson—indicating that Jackson produced the policy copy—the Court will ignore the addendum as there is no evidence that it was part of the negotiated agreement between Cooke and the insurer.

The policy also stated that the first premium for a new term would be due at the end of the previous term and that "[p]remiums for the new term will be due and payable at the premium frequency shown on a Policy Data Page." (R. 37-1, Policy at 18.)

The renewal provision also stated that the policy would be renewed if the premium were paid within the grace period. (*Id.*) The grace-period provision guaranteed Cooke a 31-day period "beginning on the due date to pay the premium due." (*Id.*) The policy would remain in force during a grace period, and if Cooke died during a grace period the unpaid premium would be deducted from the policy's proceeds. (*Id.*) By the same token, if a premium that was not paid "on or before its due date" were also not paid before the end of the grace period, the policy would be terminated. (*Id.*)

On May 30, 2013, Jackson issued a letter to Cooke, titled "IMPORTANT NOTICE – PREMIUM CHANGE," informing Cooke that his premium would increase beginning July 28, 2013: "Your new premium of $2,835.85 will be billed at the same frequency or mode as your current premium. This is your new modal premium amount." (R. 37-2, May 30 Letter at 1.) On or about July 28, 2013, Jackson attempted to automatically withdraw the $2,835.85 payment from Cooke's bank account, but the withdrawal failed for a lack of sufficient funds. (R. 52, Pl.'s Resp. to Facts ¶ 26.) This failed withdrawal triggered a 31-day grace period, which would expire on August 28, 2013, during which Cooke was required to pay the overdue premium or the policy would lapse. (*Id.* ¶ 29.) Jackson notified Cooke of his account deficiency in a letter dated August 9, 2013. (R. 37-3, Aug. 9 Letter at 1.) The letter informed Cooke that the policy would "terminate if the renewal premium [was] not received by the last day of the grace period." (*Id.*) The letter also notified Cooke that his billing had been changed to direct, rather than automatic withdrawal. (*Id.*)

On August 15, 2013, Jackson sent Cooke a payment notice demanding a quarterly premium of $8,637.94. (R. 37-4, Aug. 15 Letter at 1.) The notice listed the due date for this quarterly premium as July 28, 2013. (*Id.*) The August 15 notice also stated that "[p]ayment must be received by the due date shown above or your policy will enter its grace period and will terminate if the renewal premium is not received by the last day of the grace period." (*Id.*)

Cooke failed to make any payments before August 28, 2013. (R. 52, Pl.'s Resp. to Facts ¶ 36.) On September 10, 2013, Cooke passed away. (*Id.* ¶ 39.) On September 12, 2013, Plaintiff, without informing Jackson that her husband had passed away, mailed the demanded quarterly premium to Jackson, which Jackson received the next day. (*Id.* ¶ 41.) Because Jackson had not yet processed Plaintiff's check, it issued a notice of policy termination on September 16, 2013, which stated that Jackson would reinstate the policy if all past premiums were paid within 61 days of the defaulted premium, provided that Cooke was still alive when the premiums were received. (R. 54, Def.'s Resp. to Facts ¶ 36; *see also* R. 37-6, Sept. 16 Letter at 1.) When Jackson processed the quarterly payment, it reinstated the policy. (R. 52, Pl.'s Resp to Facts ¶ 42.) After Plaintiff notified Jackson of Cooke's death and submitted a claim on September 20, 2013, Jackson issued a letter on October 23, 2013, denying her claim because the premium was not paid during Cooke's lifetime and the policy was thus not eligible for reinstatement. (*Id.* ¶¶ 43-44.)

## PROCEDURAL HISTORY

Plaintiff filed her breach-of-contract complaint on January 27, 2015. (R. 1, Compl.) Plaintiff alleged that Jackson breached the insurance contract in various ways, that its mid-grace-period request for a higher premium payment modified the contract, that Jackson waived its right to demand quarterly payments, and that Jackson was estopped from requiring a quarterly

4

payment because Plaintiff reasonably relied on its earlier representations that she would have 31 days to pay the monthly amount required to reinstate the policy. (*Id.* ¶¶ 28-61.) Jackson answered on March 24, 2015. (R. 10, Answer.)

Plaintiff filed a motion for judgment on the pleadings on July 2, 2015. (R. 18, Motion.) On March 15, 2016, this Court entered a memorandum opinion and order denying Plaintiff's motion, in large part because Jackson denied that the entire policy was before this Court and claimed that additional contracts that were part of the policy allowed Cooke to pay monthly subject to specific terms and conditions.[4] (*See id.* at 10-11, 13.) Jackson argued that "additional contractual terms and documents, including, but not limited to, the Additional Contract, were not attached to the Complaint . . . and contain additional applicable terms, including as to the premium 'due' upon default of a monthly installment payment." (R. 24, Resp. at 6.)

On April 25, 2016, Plaintiff filed her first amended complaint, abandoning her waiver and estoppel counts and proceeding on one count of breach of contract and one count of vexatious and unreasonable conduct. (R. 37, First Am. Compl.) Plaintiff alleges that, by demanding a quarterly premium 18 days into the 31-day grace period, Jackson was required to provide a new 31-day grace period and that its failure to pay benefits when Cooke died during this second grace period constitutes a breach of the policy. (*Id.* ¶¶ 28-42.) Plaintiff also alleges that Jackson's conduct was vexatious and unreasonable in a variety of ways under the Illinois Insurance Code, 215 ILL. COMP. STAT. 5/155. (*Id.* ¶¶ 43-53.) Jackson answered on May 16, 2016.

---

[4] Jackson made various statements about these contracts, later revealed to be the EFT Applications, in its response to the motion for judgment on the pleadings, both describing them as "a separate contract," (*e.g.*, R. 24, Resp. at 4), and claiming that these contracts constituted part of the policy itself, (*e.g.*, *id.* at 5 ("[U]nder the complete Policy, including the Additional Contract," the quarterly premium was due.)). (*See also* R. 43, Def.'s Mem. at 4 ("The Insured subsequently entered into additional EFT Contracts" which "are agreements to allow a policy owner to pay his/her premiums via monthly installments toward the total premium due that is stated on a policy data page."); *id.* at 10 ("Put simply, the Insured was bound to all provisions of the Policy, including the EFT Contracts.").)

(R. 38, Answer.) Discovery has now closed, and the parties each move for summary judgment in their favor. (R. 42, Def.'s Mot.; R. 47, Pl.'s Mot.)

In support of its motion, Jackson argues that it never breached the policy by terminating it for failure to pay the premium. Jackson argues generally that a quarterly premium was due from the beginning, by the terms of the policy, and so it was not required to provide a second grace period when it demanded that quarterly premium after Cooke's default. (R. 43, Def.'s Mem. at 9-14.) Jackson refers to the Policy Data Page, which lists the premium frequency as quarterly, and argues that Cooke was only able to pay monthly installments toward that quarterly premium by virtue of the EFT contracts. (*Id.* at 9-10.) Because the policy states that "[p]remiums for the new term will be due and payable at the premium frequency shown on a Policy Data Page" and "at the end of the previous term," (R. 37-1, Policy at 18), Jackson concludes that the quarterly premium was due on July 28, 2013, notwithstanding its voluntary agreement to allow Cooke to pay monthly installments toward that quarterly premium. (R. 43, Def.'s Mem. at 9-10.) Jackson also argues that neither its letters to Plaintiff nor any phone call with a call center representative could have modified the policy, as any such modifications must be made in writing by the president, vice president, secretary, or assistant secretary of Jackson.[5] (*Id.* at 11-14 (citing R. 37-1, Policy at 14).) Finally, Jackson argues that, because it did not breach the policy, there can be no vexatious and unreasonable conduct under the Illinois Insurance Code. (*Id.* at 14.)

---

[5] In her amended complaint, Plaintiff alleges that she spoke with a customer service representative on or about August 15, 2013, and that this representative informed her that Jackson had withdrawn its consent for Cooke to pay monthly premiums and was demanding a quarterly premium. (R. 37, First Am. Compl. ¶ 16.) Plaintiff also alleged that this representative told her that the quarterly premium must be paid before September 15, 2013, for the policy to remain active. (*Id.*) Although Plaintiff alleges that "Insurers breached the contract by not honoring its verbal agreement," (*id.* at 41), she abandons this claim in her motion for summary judgment. Accordingly, the Court leaves this argument and its attendant factual disputes aside.

Plaintiff meanwhile argues that Jackson breached the policy in several ways. Most simply, Plaintiff argues that "[t]he premium that was overdue, up until the August 15, 2013 notice of quarterly premium due, was monthly." (R. 48, Pl.'s Mem. at 10.) Because neither the policy, the EFT applications, nor any correspondence between Jackson and Cooke referred to the monthly premiums as "monthly installments toward the quarterly premium," Plaintiff argues that both the monthly payment amount and the quarterly payment amount are rightly considered premiums. (*Id.* at 9-10.) To the extent that the policy's grace-period provision's mention of the "premium due" can be read as applying to either the original monthly premium or the later-demanded quarterly premium, Plaintiff argues that such ambiguity must be resolved in favor of the insured. (*Id.* at 8.) Plaintiff also argues that Jackson breached the contract by reinstating the policy prior to learning of Cooke's death without an application from Cooke, as set forth in the policy, and that Jackson's lapse notices did not comply with the requirements of the Illinois Insurance Code. (*Id.* at 11-15.) Plaintiff finally argues that Jackson's conduct in denying her claim was vexatious and unreasonable in numerous ways. (*Id.* at 15-19.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v.*

*Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted). When considering cross-motions for summary judgment, the Court must "construe all facts and inferences in favor of the party against whom the motion under consideration is made." *Orr v. Assurant Emp. Benefits*, 786 F.3d 596, 600 (7th Cir. 2015).

The movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (citation and internal quotation marks omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [their] favor." *Id.* (citation and internal quotation marks omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). Nor can "speculation and conjecture" defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013).

The Court cannot weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the trier of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629

F.3d 697, 704-05 (7th Cir. 2011). Instead, the Court's role is simply "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249).

## ANALYSIS

### I.    Breach of Contract

Although there are numerous points of dispute between the parties, the main issue in this case is whether Jackson was required under the policy to grant Cooke a full 31-day grace period as a result of its August 15 demand for a full quarterly premium.[6] The Court finds that the August 15 letter constituted a demand for a new premium, and thus the policy required Jackson to provide Cooke with 31 days to pay the premium due.

Under Illinois law, "the essential elements of a breach of contract are: (i) the existence of a valid and enforceable contract, (ii) performance by the plaintiff, (iii) breach of contract by the defendant, and (iv) resultant injury to the plaintiff." *Batson v. Oak Tree, Ltd.*, 2 N.E.3d 405, 414 (Ill. App. Ct. 2013). Insurance contracts embody the agreements of the parties and the terms of the policy constitute the scope of the insurer's liability. *See Pekin Ins. Co. v. Precision Dose, Inc.*, 968 N.E.2d 664, 679 (Ill. App. Ct. 2012). "Provisions that limit or exclude coverage will be interpreted liberally in favor of the insured and against the insurer." *Id.* at 673. An insurance policy is a contract solely between the insured and the insurer, and the named beneficiary has no interest under the policy while the insured is alive. *See Pritza v. Vill. of Lansing*, 940 N.E.2d 1164, 1173 (Ill. App. Ct. 2010) (stating that an insurance policy is a contract between an insurer

---

[6] Jackson criticizes Plaintiff for raising different legal theories during the course of this litigation as to how it allegedly breached the policy. (*See* R. 53 at 4-5.) To the extent Plaintiff has done so, her actions were not improper. *See Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997) ("[M]atching facts to a legal theory was an aspect of code pleading interred in 1938 with the adoption of the Rules of Civil Procedure. . . . [A] plaintiff may substitute one legal theory for another without altering the complaint." (internal citation omitted)).

and an insured). However, a named beneficiary of a life insurance policy obtains a vested and absolute right to the proceeds upon the death of the insured, as provided by the terms of the policy. *See Reliance Standard Life Ins. Co. v. Magli-Grant*, 503 F. Supp. 2d 1050, 1053 (N.D. Ill. 2007) (citing *Bank of Lyons v. Schultz*, 318 N.E.2d 52, 57 (Ill. App. Ct. 1974)).

Under Illinois law, contracts "must be construed as a whole, viewing each provision in light of the other provisions." *United States v. Rogers Cartage Co.*, 794 F.3d 854, 861 (7th Cir. 2015) (citation omitted); *see also Smith v. Am. Heartland Ins. Co.*, --- N.E.3d ---, 2017 WL 499838, at *4 (Ill. App. Ct. 2017) ("An insurance policy, like any other contract, must be construed as a whole, giving effect to every provision."). "[I]nstruments executed at the same time, by the same parties, for the *same purpose*, and in the course of the same transaction are regarded as one contract and will be construed together." *Dearborn Maple Venture, LLC v. SCI Ill. Servs., Inc.*, 968 N.E.2d 1222, 1232 (Ill. App. Ct. 2012) (citation omitted).

"If the words used in the policy are unambiguous, then they are given their plain, ordinary, and popular meaning." *Cty. Mut. Ins. Co. & Livorsi Marine, Inc.*, 856 N.E.2d 338, 343 (Ill. 2006). But if the terms of an insurance policy are ambiguous, they will be construed strictly against drafter of the policy. *See Pekin Ins. Co. v. Wilson*, 930 N.E.2d 1011, 1017 (Ill. 2010). A term or phrase in an insurance policy is ambiguous if it is "susceptible to more than one meaning," *id.*, but not simply because it is "undefined," *Levy v. Minn. Life Ins. Co.*, 517 F.3d 519, 524 (7th Cir. 2008). Once the Court finds an ambiguity, then extrinsic evidence may be considered to determine the meaning of the words included in the insurance policy. *Cty. Mut. Ins. Co.*, 856 N.E.2d at 343.

Based on the plain language of the policy, it is clear that a 31-day grace period must be provided for any premium that was not paid on or before its due date and the policy may not be terminated during the grace period. The policy's grace-period provision states that:

> [W]e allow a Grace Period of 31 days beginning on the due date to pay the premium due. The policy will remain in force during the Grace Period. If the Insured dies during the Grace Period, the unpaid premium will be deducted from the Proceeds.

> Any premium not paid on or before its due date is a premium in default. If a premium in default is not paid before the end of the Grace Period, the policy will terminate.

(R. 37-1, Policy at 18.) Accordingly, the question before the Court is whether the monthly payment on which Cooke defaulted qualifies as a "premium" under the policy, and if so whether later requiring the full quarterly payment changed the premium that was "due."

Plaintiff argues that the monthly payment was the premium due on July 28, while Jackson argues that it was merely a monthly installment toward the underlying quarterly premium that was due on that date. The policy never defines "premium" or "due," but the Court finds that based on their "plain, ordinary and popular meaning" the monthly required payment was a premium. *Cty. Mut. Ins. Co.*, 856 N.E.2d at 343. According to Black's Law Dictionary, a premium is "[t]he amount paid at designated intervals for insurance; esp., the periodic payment required to keep an insurance policy in effect." *Premium*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also Premium*, OXFORD ENGLISH DICTIONARY (defining "premium" as "[t]he amount payable for an insurance policy; *spec.* an amount paid regularly to maintain cover against particular contingencies"). There is nothing to suggest that a premium is a special kind of payment, as opposed to other less-special payments, and Jackson points to no cases holding otherwise. Instead, when a payment is required to maintain an insurance policy, and when

11

making that payment is sufficient to maintain the policy for some period without requiring some additional payment, it qualifies as a premium under that term's common meaning.

Additionally, the Court must interpret the policy as a whole. *Rogers Cartage Co.*, 794 F.3d at 861. The policy consistently speaks of payments made at different frequencies as "premiums." In relevant part, the premium payments provision states that:

> The first premium for this policy is due on the Policy Date. Subsequent premiums are due in advance of the period to be covered. Premium(s), . . . and the premium frequency you have selected, are shown on a Policy Data Page. Premiums may be paid on any mode shown on a Policy Data Page. Premiums may be paid by any other mode or method with our consent.
> . . .
> On any Term Expiry Date, we may adjust the premiums for this policy. . . . We will notify you prior to any such adjustment. The annual premium will never be greater than the Guaranteed Maximum Annual Premium shown on a Policy Data Page. . . . The Initial Annual Premium and Guaranteed Maximum Annual Premiums have been determined on a uniform basis for Insureds of the same age, sex, and classification.

(*Id.* at 17.) The Policy Data Page lists these guaranteed maximum annual premiums and explains that "[t]he annual premiums shown above may be converted to premium amounts payable more frequently by multiplication of the annual premium by the modal factors on a policy data page."[7] (*Id.* at 11.) Finally, the renewal option provision states that:

> This policy may be renewed without evidence of insurability on each Term Expiry Date for a new term period by payment of the premium then due. Guaranteed Maximum Annual Premiums for renewal periods are shown on a Policy Data Page. . . .
>
> The first premium for a new term will be due at the end of the previous term. This policy will renew if this premium is paid within the Grace Period. Premiums for

---

[7] These modal factors are used to convert the annual premium amount into the amount actually due based on the frequency of payments. Paying annually, the modal factor is 1, meaning that an insured simply pays the annual premium amount. The modal factor for quarterly payments is 0.265, and for monthly payments by automatic bank withdrawal it is 0.087. (R. 37-1, Policy at 9.)

the new term will be due and payable at the premium frequency shown on a Policy Data Page.

(*Id.* at 18.) The Policy Data Page lists the premium frequency as "quarterly." (*Id.* at 9.)

Although the policy defaults to assuming premiums will be paid at the same frequency as is listed on the Policy Data Page, it repeatedly references annual premiums while acknowledging that payments made at other frequencies are also premiums. Most notably, the Policy Data Page that sets forth the policy's quarterly premium frequency only lists the actual premium *amount* in the form of the annual premium. (*Id.*) It also states that "annual premiums . . . may be converted to premium amounts paid more frequently." (*Id.* at 11.) Further, the modal factor chart lists the conversion rate for premiums charged at different frequencies, (*id.* at 9); this suggests that payments made to keep the policy current, which are made at the listed frequency with the listed ratio to the annual premium, are themselves premiums. The policy makes no reference to or provision for the payment of installments toward a larger premium that are not themselves premiums.

Jackson argues that the Policy Data Page lists the premium frequency as quarterly, and that changing the frequency of the premium due under the policy would require the written approval of one of its senior officers to modify the policy. (R. 43, Def.'s Mem. at 9.) Because no such written approval was made, Jackson argues that the premium that was due was the quarterly one, even if Cooke paid it in monthly installments. Jackson's interpretation of the provision requiring written approval for modification is too broad. The provision Jackson cites only applies to changes in the contract language, not to changes made *in accordance with* the contract language. For instance, Jackson was permitted to change the annual premium amount after Cooke's initial 15-year term expired, because the policy states that "[o]n any Term Expiry Date, we may adjust the premiums for the policy." (R. 37-1, Policy at 17.) Even though the premium is

stated on the Policy Data Page, Jackson did not require written approval of a senior officer to change this amount, because such a change was explicitly contemplated. By the same token, the premium payments provision states that "[p]remiums may be paid on any mode shown on a Policy Data Page" and "[p]remiums may be paid by any other mode or method with our consent." (*Id.*) Since five premium frequencies—from annual to monthly bank draft—are shown in the modal factor chart on the Policy Data Page, it could be argued that the policy provides for monthly premiums without any required consent. (*Id.* at 9.) Regardless, the provision clearly provides that the premium mode can be changed with consent, as it apparently was through Jackson's approval of the EFT applications. Because the policy explicitly provides for this change in its administration, changing the policy's premium frequency did not require written approval from a senior officer any more than changing the policy's premium amount did. Even though this changes information set forth on the Policy Data Page, it does so in the same way as the premium amount change: as contemplated by the policy's provisions.

For the reasons set forth above, the Court finds that the monthly payments Cooke made for approximately 15 years, and the monthly payment demanded at the outset of the new policy period, were unambiguously "premiums" when that term is given its "plain, ordinary, and popular meaning." *Smith*, 2017 WL 499838, at *4. Because Jackson demanded the July 28 premium be paid, and would have maintained the policy if this premium were paid, the July 28 premium was "due" for purposes of the grace-period provision. Although Jackson had consented to allow Cooke to pay monthly premiums for many years, it was entitled under the policy to revoke its consent and insist on the original quarterly premium frequency when Cooke failed to pay the monthly premium. (*See* R. 37-1, Policy at 17, 33.) However, when it did so 18 days into the grace period on August 15, the result was that a new premium was due. Jackson had never

requested a quarterly premium prior to its August 15 letter, it never disclosed the amount of the

quarterly premium prior to this letter, and it has acknowledged that paying the monthly premium

would have been sufficient to maintain the policy. Jackson has provided no definition of "due"

that would include a payment that has not been requested and need not be paid, as would be

necessary to include the quarterly premium before the August 15 letter. The Court finds that only

on August 15 did the quarterly premium amount become due, and thus Jackson was required to

give Cooke 31 days to pay that premium in accordance with the grace-period provision.

Even if Jackson had sufficiently shown that an undemanded, undisclosed premium were

also due based on the policy's plain language, the grace-period provision would still require a

new grace period beginning on August 15. Jackson argues that "the 'premium due' pursuant to

the Policy Data Page from the inception of the Policy to the expiration of the Grace Period was

always the Quarterly Premium." (R. 43, Def.'s Mem. at 9.) However, Jackson neglects that the

grace-period provision requires it to provide 31 days "*beginning on the due date* to pay the

premium due." (R. 37-1, Policy at 18.) The grace-period provision states that the "premium due"

is the one that was to be paid "on the due date." (*Id.*) Even if the monthly payment and the

quarterly payment were both premiums that were due in some sense, the monthly premium is the

only one that Jackson required to be paid on July 28. Given that neither party expected Cooke to

pay the quarterly premium on July 28, that Jackson did not communicate the amount of the

quarterly premium prior to July 28, and that Jackson attempted to collect only the monthly

premium on July 28, the Court can see no basis for concluding that July 28 was the "due date"

for the quarterly premium.

Jackson's theory, that the quarterly premium was due on July 28 and thus its 31-day

grace period expired on August 28, is also untenable as a matter of policy. Jackson argues, in

essence, that only the quarterly premium was ever due, that premiums are due prior to their period of coverage, and thus that the quarterly premium was due on July 28 notwithstanding Jackson's consent to make monthly payments toward the quarterly premium. While perhaps this theory could be credited on the facts of this case in isolation, where the insured failed to make the first monthly payment of a quarter, it cannot apply generally. Suppose that Cooke had paid the July 28 premium but defaulted on the August 28 premium. Under Jackson's interpretation, it could immediately demand a quarterly premium, which it would contest was due on July 28, meaning that its grace period would expire on the very day of the default.[8] This reading of the grace-period provision is plainly inconsistent with the Illinois Insurance Code, which explicitly requires that a one-month grace period be given "within which the payment of any premium after the first may be made." 215 ILL. COMP. STAT. 5/224(1)(b). If the grace period has expired by the time a default occurs, then there was never a grace period at all.

Even if Jackson could show that the policy did not require it to provide a new grace period upon its higher quarterly premium demand, the policy would still be ambiguous, which would permit the Court to consider extrinsic evidence. The only interpretation of the policy that makes sense of Jackson's premium billing practices is that any amount demanded to keep the policy current qualifies as a premium. As noted, under the policy the premium for a payment period is due on or before the first day of that period. If that premium is not paid prior to the relevant period, it is "a premium in default," triggering a 31-day grace period and termination of

---

[8] Jackson suggests that Cooke need not even have defaulted on a monthly payment for Jackson to be able to revoke the policy, arguing that "although it was its custom to do so . . . , Jackson was not required to revoke the privilege of paying monthly drafts in order for the Quarterly Premium—the premium owed as set forth in the Policy—to be considered 'due' by the due date (July 28)." (R. 53 at 12.) Taking Jackson's arguments together, it would appear that Jackson could, at any time after August 28, revoke the policy at will for failure to pay the "due" quarterly premium within the grace period even though it had never requested the quarterly premium. This at-will revocability stands in direct conflict with the Illinois Insurance Code's protections and is not a reasonable interpretation of the policy itself.

the policy if the premium is not paid within those 31 days. (*Id.* at 18.) Although the record does not definitively show whether Jackson collected the three monthly payments prior to the covered quarter or during the covered quarter for the first 15 years, it is undisputed that the first monthly payment at the higher renewal rate was due on July 28, 2013, which is the first day of that renewal policy. (R. 52, Pl.'s Resp. to Facts ¶ 20.) This fact strongly suggests that Jackson had previously billed on the same schedule.

If these monthly payments were in fact installments toward the quarterly premium, however, then Cooke's policy was in default for two-thirds of every quarter and subject to termination for one-third of every quarter. Under Jackson's theory, the entire quarterly premium would be due on the first day of the covered period; when only one-third of that premium is paid through the monthly "installment" —as it apparently was every quarter for 15 years—the policy is in default by its own terms. When the second installment toward the quarterly premium is paid the next month, the entire premium has still not been paid and the grace period has expired, warranting termination under the policy. Only two-thirds of the way through each quarterly payment period is the policy brought current, for one month before the next quarter begins. By Jackson's account, the policy would presumably be terminable at will by Jackson for the insured's failure to pay between the second and third monthly installments, despite the insured paying according to Jackson's billing demands.[9] This cannot be how the policy operates. *Bd. of Educ. of Waukegan Cmty. Unit Sch. Dist. No. 60 v. Orbach*, 991 N.E.2d 851, 857 (Ill. App. Ct. 2013) (setting forth "the principle that a contract should be construed to avoid absurd results").

---

[9] Jackson confirms this result of its theory, stating that "although it was its custom to do so . . . , Jackson was not required to revoke the privilege of paying monthly drafts in order for the Quarterly Premium—the premium owed as set forth in the Policy—to be considered 'due' by the due date (July 28)." (R. 53, Def.'s Resp. at 12.) Despite its repeated insistence that it was Cooke's failure to pay the monthly premium that prompted the present dispute, this statement by Jackson suggests that the quarterly premium was the only one that was "due," and that Cooke's failure to pay this due premium in advance of the period it covers would have rendered the policy terminable.

Jackson does not directly address this feature of its billing practices, but it does raise it to respond to one of Plaintiff's arguments. Jackson argues that "Plaintiff's forced interpretation that only the monthly electronic bank draft was 'due' by the end of the Grace Period" is inconsistent with the policy: "If only the monthly electronic bank draft was paid by the end of the Grace Period, that payment would have been made at the same time the Insured owed a second monthly installment. Thus, the insured would have remained a month behind and would not have provided payment 'in advance of the period to be covered,' *i.e.*, the portion of the quarterly term." (R. 53, Def.'s Resp. at 12.) Leaving aside that this reasoning would apply just as well to an insured who signed up under a monthly premium, which the policy provides as a possibility, (R. 37-1, Policy at 9), Jackson here takes the position that the monthly payments, under the terms of the policy, must be made in advance of the period to be covered, which it argues is the monthly period. The sentence of the policy that Jackson quotes states, in full, that "Subsequent premiums are due in advance of the period to be covered." (*Id.* at 17.) By taking the position that Cooke's "monthly installments" must be paid in advance to accord with a policy provision that applies to "premiums," by identifying the month-long portion of a quarterly term to be "the period to be covered," and by arguing that defaulting on a monthly payment was a sufficient default to trigger the grace-period provision before a quarterly payment was even demanded, Jackson describes a "monthly installment toward a quarterly premium" that is in every relevant way identical to a monthly "premium."

Accordingly, Jackson is unconvincing in its argument that "[w]hen an insured, pursuant to an EFT Contract, elects to pay the premium stated in his/her policy in monthly installments via automatic electronic bank withdrawals . . . , Jackson provides a slight discount in payment because having premiums paid in advance by automatic electronic monthly bank drafts is more

efficient for the company." (R. 53, Def.'s Resp. at 13 n.7.) The only premium that was demanded in advance of a period of coverage was Cooke's monthly premium, demanded in advance of the first month of coverage under the new policy rate. Jackson does not argue that it would grant a premium reduction for the convenience of having its quarterly premium paid later than contractually required; because the quarterly premium would not be paid in full until two months into the quarter, this also suggests that the monthly payment was a premium, as it was paid in advance of a month to be covered in accordance with the policy.

Additionally, every communication between Jackson and Cooke suggests that the monthly payments made by Cooke were, in fact, premiums. The EFT applications do not state that the monthly payments would be installments toward a quarterly premium; instead, they state that "Premium Payments will be debited from your account on or about the premium due date."[10] (See, e.g., R. 37-1, Policy at 39.) For 15 years after Cooke completed the first EFT application, Jackson debited funds from his account on or about the 28th of every month, suggesting that this was the "premium due date." (R. 52, Pl.'s Resp. to Facts ¶ 9.) More directly, the letter Jackson sent to Cooke on May 30, 2013, explaining that it was increasing Cooke's premiums at the expiration of the policy's initial term, repeatedly refers to his new monthly payment as a premium. For instance, the letter states, "Your new premium of $2,835.85 will be billed at the same frequency or mode as your current premium. This is your new modal premium amount."

---

[10] Jackson disputes the value of Plaintiff's "observation" that the EFT applications do not state that they authorize monthly installments toward a premium, not monthly premiums, arguing that "[t]hat observation is not 'evidence' to rebut Jackson's unrebutted testimony as to the purpose of the EFT Contracts. (R. 53, Def.'s Resp. at 13.) The Court observes that the portions of Linda Woodell's deposition that Jackson cites as unrebutted testimony consists of Woodell asserting without support or explanation that these payments were merely installments. (See R. 44, Def.'s Facts ¶¶ 11-12.) Woodell is certainly qualified to testify as to her understanding of the relationship between the policy and the EFT applications, but her statements asserting a legal conclusion are not unrebutted evidence of the truth of that legal conclusion. See United States v. Blount, 502 F.3d 674, 680 (7th Cir. 2007) ("There is a difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts.").

(R. 37-2, May 30 Letter at 1.) The letter does not refer to a quarterly premium, does not mention installments toward greater premiums, and clearly identifies $2,835.85—the amount of the alleged monthly installment—as "[y]our new premium."[11] (*Id.*) Further, although Jackson changed Cooke's premium amount at the end of the initial term of the policy, it never disclosed the amount of the $8,637.94 quarterly premium until its August 15 payment notice, which was sent after Cooke's default on the monthly premium and 18 days into the new policy's term. (R. 37-4, Aug. 15 Letter at 1.) The only way that Cooke could have determined the amount of the quarterly premium that was, according to Jackson, always due would have been to convert the monthly premium amount into the annual premium and back into a quarterly premium using the modal factor chart on the Policy Data Page. (R. 37-1, Policy at 9.) The applicability of this chart would not be obvious if the monthly payment were not a premium. Further, the quarterly premium amount would seem sufficiently irrelevant that it need not be disclosed if and only if the monthly payment amount were a monthly premium, as Jackson had been treating it for 15 years.

The renewal option provision does state that, when the policy is renewed at the end of the initial term, "[p]remiums for the new term will be due and payable at the premium frequency shown on a Policy Data Page." (*Id.* at 18.) Because the Policy Data Page identifies the premium frequency as quarterly, this suggests that a quarterly payment would be due at the beginning of a

---

[11] There are two references in the correspondence between the parties prior to the quarterly premium being demanded that refer to "premium payments," although neither clearly suggests that these are payments *toward* a premium rather than payments *of* a premium. The EFT applications list as conditions that "[p]remium payments will be debited from your account on or about the premium due date" and "[p]ayment of premium under the Plan may be discontinued by the Company or the Undersigned upon thirty (30) days written notice," (*e.g.*, R. 37-1, Policy at 33), and Jackson's August 9 letter states that "[w]e are writing regarding your recent premium payment," (R. 37-3, Aug. 9 Letter at 1). The August 9 letter also, however, refers to the defaulted bank draft as "the uncollected premium." (*Id.*) The Court finds that these ambiguous references to "premium payments" are not sufficient to overcome the clear indications set forth above that the monthly payment was, in fact, a premium itself.

new term. However, the premium adjustment provision states that "[o]n any Term Expiry Date, we may adjust the premiums for this policy . . . . We will notify you prior to any such adjustment." (*Id.* at 17.) Cooke was informed that his premium would be changed to a $2,835.85 monthly payment; he was not informed that it would be changed to a $8,637.94 quarterly payment. While the renewal option provision suggests that the policy would revert to a quarterly premium being due, Jackson's notification in accordance with the premium adjustment provision confirms that it continued to treat a monthly premium as due.

Even if both premiums were due on July 28, this would at best render the grace-period provision ambiguous. The policy does not clearly establish that the monthly payment was not a premium, nor does it on its face militate the conclusion that default on the monthly premium constitutes default on the quarterly premium even before it is demanded. Jackson cites no case law establishing that required payments may not be premiums or that even undemanded premiums are "due." The Court can also find no such cases. Instead, Jackson merely cites the testimony of its Policy Administration Oversight Manager that the EFT applications allow a policy owner to pay their listed premiums by installments without changing the underlying premium that is due. (R. 53, Def.'s Resp. at 11; *see also* R. 44, Def.'s Facts ¶ 11; R. 44-4, Woodell Dep. at 19, 20, 62.) By all appearances, Jackson never communicated this view until after litigation had been initiated, either in word or in deed. Jackson's undisclosed understanding of the effects of its agreements cannot govern the present dispute. *Ortony v. Nw. Univ.*, 736 F.3d 1102, 1104 (7th Cir. 2013) ("[T]he construction of a contract is an objective exercise; private beliefs and meanings do not matter. Even a Professor of English who agrees with Jacques Derrida about the uncertain meaning of most language is bound by his contracts." (internal citation omitted)). The policy does not define what does or does not qualify as a premium,

whether undemanded premiums are "due" or have "due dates" under the grace-period provision, or the legal effect of Jackson consenting to allow a policyholder to pay a premium with a different frequency with Jackson's consent. The policy can plausibly be read to require that a new grace period must be provided when a new premium payment is demanded; assuming that it can be read otherwise, as Jackson contends, this renders the policy ambiguous. This Court must resolve such ambiguities in favor of the insured. *Hanson*, 932 N.E.2d at 1182. Accordingly, the Court finds that the grace-period provision requires that Jackson provide 31 days to pay from the date of demanding a new, higher premium amount.

In its response, Jackson argues that if "Plaintiff is again attempting to claim only a monthly payment was owed," then "that [monthly] payment was never made and the Insured therefore failed to substantially perform under the Policy." (R. 53 at 11.) To be clear, the Court finds that, on July 28, Cooke was only required to pay a monthly premium in order to keep the policy current; accordingly, July 28 was the "due date" for a monthly premium. On July 28, Cooke was not required to pay a full quarterly premium in order to keep the policy current; accordingly, July 28 was not the "due date" for a quarterly premium. On August 15, Jackson communicated to Cooke that it was revoking its consent to pay monthly premiums and that he would have to pay the full quarterly premium to keep the policy current; as a result, the "due date" for the quarterly premium was, at the earliest, August 15.

For these reasons, the Court finds that under the policy, only the monthly premium was due on July 28. When Cooke defaulted on this payment, he was entitled to a 31-day grace period to pay the overdue monthly premium of $2,835.85. When Jackson revoked its consent to pay monthly premiums on August 15, as it was entitled to do under the policy and the terms of the EFT applications, a different premium became due, and thus Cooke was entitled to a new 31-day

grace period. Further, even if Jackson is correct that this result is not strictly required by the policy, it has failed to establish that the policy clearly provides that under the facts of this case the grace period for a quarterly premium would expire on August 28. At best, the policy is ambiguous, and this Court must resolve ambiguities in favor of the insured. *Hanson*, 932 N.E.2d at 1182. Because Cooke died before the grace period governing his policy expired, Jackson was required to honor the policy under the grace-period provision. Accordingly, Plaintiff is entitled to summary judgment in her favor.

## II. Section 234

Although the Court finds in favor of Plaintiff based on her grace-period provision claim, it will briefly address another argument that would entitle her to summary judgment in the alternative. Plaintiff argues that Jackson declared the policy lapsed within six months after default without providing Cooke with sufficient notice under Illinois law.[12] (R. 48, Pl.'s Mem. at 12-15.) The Illinois Insurance Code requires that:

> (1) No life company doing business in this State shall declare any policy forfeited or lapsed within six months after default in payment of any premium installment or interest or any portion thereof, nor shall any such policy be forfeited or lapsed by reason of nonpayment when due of any premium, installment or interest, or any portion thereof, required by the terms of the policy to be paid, within six months from the default in payment of such premium, installment or interest, unless a written or printed notice stating the amount of such premium, installment, interest or portion thereof due on such policy, the place where it shall be paid and the person to whom the same is payable, shall have been duly addressed and mailed . . . to the person whose life is insured . . . at least fifteen days and not more than forty-five days prior to the day when the same is due and payable, before the beginning of the period of grace . . . . Such notice shall also state that

---

[12] Jackson argues in its response that, because Plaintiff never articulated a claim under Section 234 previously, she should not be permitted to do so for the first time at summary judgment. (R. 53, Def.'s Resp. at 4.) The Court notes that Plaintiff pled breach of contract, and Plaintiff's Section 234 claim is ultimately an alternative breach-of-contract theory. The fact that Plaintiff did not fully articulate this theory previously does not preclude her from doing so now, especially as Jackson has had an opportunity to respond to it. *Albiero v.*, 122 F.3d at 419.

unless such premium or other sums due shall be paid to the company or its agents the policy and all payments thereon will become forfeited and void . . . .

(2) This section shall not apply . . . to any policies upon which premiums are payable monthly or at shorter intervals.

215 ILL. COMP. STAT. 5/234. Plaintiff argues that Jackson's premium notices did not include the statutorily required language, and that the quarterly premium notice was not sent at least fifteen days prior to the day when the premium was due. (R. 48, Pl.'s Mem. at 13.) Accordingly, Plaintiff contends that Jackson was proscribed from declaring the policy lapsed within six months of the default, and thus the policy was in effect when Cooke died on September 10. (*Id.* at 13-15.) Although the statute does not apply when premiums are payable monthly, Plaintiff argues that "[o]nce Defendant revoked its consent to pay the premiums by anything other than quarterly, the notice law applied." (*Id.* at 14.)

Jackson responds that Section 234 only applies to pre-default notices, not post-default notices, so any infirmities in the language of its August 9 and August 15 letters, both sent after Cooke's July 28 default on the monthly premium, are irrelevant to Section 234. (R. 53, Def.'s Resp. at 5.) Jackson further argues that "Jackson, regardless, was exempt from complying with that section for any notice because the Insured was making monthly installment payments toward the Quarterly Premium owed." (*Id.* at 6 n.4.) Jackson opposes Plaintiff's argument that the notice law applied once Jackson revoked consent to pay monthly, arguing that "[s]etting aside that the EFT Contracts had no effect on the Policy premium . . . , again Section 234 applies to *pre-default* notices, and pre-default (*i.e.*, before July 28, 2013) the Insured was paying by monthly automatic bank drafts." (*Id.*)

The first question is whether Section 234 applies to Cooke's policy at all such that it prohibits declaring the policy lapsed within six months of default without a sufficient notice. The

Court finds that Section 234 does not apply, under the plain terms of the statute, when policy premiums are payable monthly, whether those monthly payments are premiums or not. The statute does not state that it is inapplicable only when premiums are *due* monthly, but rather when they are *payable* monthly. *See Waldschmidt v. Reassure Am. Life Ins. Co.*, 271 S.W.3d 173, 177 (Tenn. 2008) (finding that monthly installments toward an annual premium qualified as premium payments "payable monthly" for purposes of a functionally identical Tennessee statute). So long as Cooke was satisfying his premiums by paying on a monthly basis, Section 234 does not apply.

A harder question is whether Section 234 applies on the facts of this case, where the insured paid monthly until his July 28 default and the insurer reverted to quarterly premiums after this default. The Court finds that Section 234 does apply in this case. Leaving aside the parties' dispute about whether a monthly or quarterly premium was due on July 28, or both, the parties agree that the policy's premium was no longer payable monthly after Jackson's August 15 demand for a quarterly premium. Because Jackson had revoked its consent for Cooke to pay monthly, he would not have complied with his contractual premium obligations had he remedied his monthly default and continued paying monthly premiums as he always had. Jackson had changed the manner of his premium payments, under its contractual rights. Although Section 234 did not apply to Cooke's policy before August 15, because he was able to pay his premiums monthly, it did apply to the policy after August 15, because he was not able to pay his premiums monthly.

Jackson mistakenly argues that Section 234 does not apply because "Section 234 applies to *pre-default* notices, and pre-default (*i.e.*, before July 28, 2013) the Insured was paying by monthly automatic bank drafts." (R. 53, Def.'s Resp. at 6 n.4.) More accurately, Section 234

applies to *policies* with premiums that are not payable monthly. 215 ILL. COMP. STAT. 5/234(2)

("This section shall not apply . . . *to any policies* upon which premiums are payable monthly[.]"

(emphasis added)). And the statute does not require insurers to send pre-default notices, as

Jackson appears to interpret it, but instead *prohibits* insurers from declaring policies lapsed

within six months of default *if they did not send* such notices. 215 ILL. COMP. STAT. 5/234(1)

("No life company . . . shall declare any policy forfeited or lapsed within six months after default

. . . unless a written or printed notice" containing the requisite information has been sent.). In

other words, Section 234 does not prohibit sending noncompliant notices or require sending

compliant notices; it forbids insurers from terminating a policy within six months *unless* they

sent a compliant notice.

Boiled down to its essence, the statute mandates that: (1) if a policy's premiums are not

payable monthly, (2) the insurer cannot terminate the policy for defaulted premium payments

within six months, (3) unless it sent the proper notice 15 to 45 days earlier. In this case, the

premiums were not payable monthly after August 15 and Jackson never sent the proper notice,[13]

so Jackson was prohibited by Section 234 from terminating the policy until six months had

passed. Having not sent a statutorily required notice, Jackson needed to wait six months to

terminate the policy. *See Clarin Corp. v. Mass. Gen. Life Ins. Co.*, 44 F.3d 471, 477 (7th Cir.

1994) ("Since § 234(1) notice is not mandatory, the insurer must only comply with the statute if

it desires to terminate a policy within six months after default of payment." (citing *First Nat'l*

---

[13] Jackson disputes whether Section 234 applies to its August 9 and August 15 notices, because they were issued post-default rather than pre-default. (R. 53, Def.'s Resp. at 5-6.) This is beside the point. The burden of showing that a compliant notice has been issued falls upon the insurer, *Cullen v. N. Am. Co.*, 531 N.E.2d 390, 392 (Ill. App. Ct. 1988), and Jackson has failed to show that it sent any notice that complied with the statute. The Court notes in particular that Section 234 requires such a notice to include the amount of the premium due, while Jackson never disclosed the amount of the quarterly premium prior to its August 15 letter.

*Bank v. Mutual Tr. Life Ins. Co.*, 522 N.E.2d 70, 72 (Ill. 1988))). "[Section] 234(1) notice is designed to provide a warning to the insured so that the insurance company cannot 'keep [ ] silent and induc[e] the insured to forget to pay the premium.' " *Id.* (quoting *DC Elecs., Inc. v. Empl'rs Modern Life Co.*, 413 N.E.2d 23, 28 (Ill. App. Ct. 1980)). Similarly, in this case Jackson kept silent and did not disclose the fact that the quarterly premium would be immediately due if Cooke defaulted on a monthly premium. Thus Section 234 prohibited Jackson from terminating the policy.

Because Section 234 applied to the policy before the expiration of the grace period established by Cooke's July 28 default on the monthly premium, Jackson was prohibited from declaring it lapsed whether or not a second grace period was provided. As the policy was still in operation when Cooke died on September 10, 2013, Jackson breached the policy by failing to pay the policy's benefits to Plaintiff.

### III.    Vexatious and Unreasonable Delay

Finally, Plaintiff argues that Jackson has acted vexatiously and unreasonably, justifying an award of costs, legal fees, and punitive damages. (R. 48, Pl.'s Mem. at 15-19.) Plaintiff lists numerous actions that she contends were vexatious and unreasonable, including demanding a higher premium payment 18 days into the grace period, reinstating the policy without an application, entering a new lapse date into its automated system, and failing to send notices compliant with the Illinois Insurance Code. (*Id.* at 17-18.) Jackson responds that its basis for denial rests on a *bona fide* dispute and that Plaintiff's claims of breach generally lack merit. (R. 53, Def.'s Resp. at 14-15.)

"Section 155 of the Illinois Insurance Code allows an insured to recover attorney fees when the insurer's denial of coverage or delay in payment is 'vexatious and unreasonable,' or

when the insurer behaves vexatiously and unreasonably during the course of coverage litigation." *TKK USA, Inc. v. Safety Nat. Cas. Corp.*, 727 F.3d 782, 793 (7th Cir. 2013). "A court should consider the totality of the circumstances when deciding whether an insurer's conduct is vexatious and unreasonable, including the insurer's attitude, whether the insured was forced to sue to recover, and whether the insured was deprived of the use of his property." *Ill. Founders Ins. Co. v. Williams*, 31 N.E.3d 311, 317 (Ill. App. Ct. 2015) (citation omitted). If an insurer did not violate its obligations under the policy, "there can be no finding that the insurer acted vexatiously and unreasonably in denying the claim." *Rhone v. First Am. Title Ins. Co.*, 928 N.E.2d 1185, 1196 (Ill. App. Ct. 2010). Where an insurer denies coverage based upon a *bona fide* dispute, its denial does not constitute vexatious and unreasonable conduct under Section 155. *Ill. Founders Ins. Co.*, 31 N.E.3d at 317-18.

The Court finds that Jackson's denial of coverage was based on a good-faith dispute regarding the nature of Cooke's payments, which premiums were due and when, and how these issues interacted with the grace-period provision of the contract. As the Court has noted, Jackson was entitled under the policy to demand that Cooke revert to paying quarterly premiums when he defaulted on his monthly payment. Jackson's subsequent actions followed from a reasonable position on an unsettled issue of law, as evidenced by the fact that neither party nor this Court were able to locate an Illinois case directly on point. Further, the Court finds that the legal basis for Jackson's denial has remained consistent throughout this litigation, suggesting Jackson's good-faith belief in the merit of this argument. The purpose of Section 155 was to provide a remedy for insurer misconduct and to prevent an insured from seeing "practically his whole claim wiped out by expenses if the company compels him to resort to court action, although the refusal to pay the claim is based upon the flimsiest sort of a pretext." *Cramer v. Ins. Exchange*

*Agency*, 675 N.E.2d 897, 901 (Ill. 1996) (citation omitted). Jackson's denial of coverage does not appear to have been pretextual, unreasonable, or unfounded, and thus awarding costs and fees for handling Cooke's policy under Section 155 would be inappropriate.

However, the Court finds that Jackson's behavior in this litigation has been much less reasonable. Although the majority of Section 155 cases turn on the insurer's good faith in denying coverage, Section 155 also prohibits "unreasonable delay in settling a claim." 215 ILL. COMP. STAT. 5/155(1). And while most actions taken in litigation can be justified by the existence of a good-faith dispute on the merits of a claim, Section 155 allows for the awarding of costs for unnecessary motions that unreasonably delay a case. *See, e.g.*, *TKK*, 727 F.3d at 795 (granting costs under Section 155 for meritless motion to reconsider, noting that "the fees were not assessed here because an attorney acted unethically. They were assessed because the decision to file the motion was unreasonable.").

The Court finds that Jackson has unreasonably delayed the resolution of this case for no good-faith purpose. In particular, Jackson opposed Plaintiff's motion for judgment on the pleadings, contending in large part that the policy attached to the complaint was not complete and that there were additional contracts containing the terms on which Cooke was permitted to pay his premiums monthly. (*See, e.g.*, R. 24, Resp. at 3-4.) Jackson devoted three pages of its response solely to disputing that the entire policy had been submitted, including quoting more than a page's worth of its answers to the complaint, without once stating which documents were missing. (*See, e.g.*, *id.* at 6 ("Indeed, additional contractual terms and documents, including, but not limited to, the Additional Contract, were not attached to the Complaint[.]").) Jackson attached no exhibits to its response, such as a complete copy of the policy or the "Additional Contract." In fact, nearly eight months later—after this Court had denied Plaintiff's motion for

judgment on the pleadings—Jackson still would not clearly identify to Plaintiff what it believed constituted the complete policy. At a status hearing before this Court, Plaintiff's counsel represented that Jackson still had not clearly identified the bounds of the policy and Jackson's counsel represented that Jackson had provided all the relevant documents prior to the motion for judgment on the pleadings. (R. 36, Tr. of Proceedings.) In an email on April 18, 2016, Jackson finally communicated its understanding of which documents must be submitted to constitute the entire policy: in addition to the policy attached to the complaint, Jackson identified several pages of endorsement letters notifying Cooke that the company administering his insurance policy had changed and several pages relating to correcting a typo in Cooke's name in the policy. (*See* R. 51-5, Corr. at 4; *compare* R. 1-1, Policy, *with* R. 37-1, Policy.) Jackson also identified the EFT applications. (R. 51-5, Corr. at 4.)

This Court believes that this case could have been resolved on Plaintiff's motion for judgment on the pleadings one year ago. This is a straightforward insurance policy dispute with essentially undisputed facts, and the primary issue is the interpretation of the policy. Had Jackson provided with its response the full document to be construed, or clearly identified those documents it had already turned over that it contended were necessary to interpret the policy, this case may have been resolved one year ago. By frustrating Plaintiff's motion solely by pointing to the incomplete policy and then coyly refusing to identify the deficiency for months thereafter, Defendant unnecessarily and unreasonably extended this litigation for no reason related to its good-faith position on the merits.

As noted above, the purpose of Section 155 is to prevent a Plaintiff's recovery from being "wiped out by expenses if the company compels him to resort to court action, although the refusal to pay the claim is based upon the flimsiest sort of a pretext." *Cramer*, 675 N.E.2d at 901

(citation omitted). Jackson unreasonably extended this litigation by one year for no apparent purpose other than delay. Plaintiff incurred significant costs in filing this motion for summary judgment and in responding to Jackson's motion. In keeping with Section 155's purpose, the Court awards attorney fees to Plaintiff for the cost of preparing and responding to the present cross-motions for summary judgment. *See TKK USA*, 727 F.3d at 795 (upholding award of fees for an unnecessary and unreasonable motion, notwithstanding that the insurer's underlying coverage denial was based on a *bona fide* dispute).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (R. 47) is GRANTED and Jackson's motion for summary judgment (R. 42) is DENIED. The Court awards attorney fees to Plaintiff for the cost of preparing and responding to these motions. The clerk is directed to enter a final judgment in favor of Plaintiff Norma Cooke, which includes an award of reasonable attorney fees in accordance with this opinion.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: March 20, 2017**